## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————————————————————— :
: 
BEN KRAMBECK and CLAIM DOC, LLC,    :         CIVIL ACTION
: 
*Plaintiffs*,    : 
:         No. 17–3934
v.    : 
: 
DAVID FISHBONE and NEEDHAM    : 
BUSINESS CONSULTING, PA, LLC,    : 
: 
*Defendants*.    : 
————————————————————————:

**Goldberg, J.**                                          **January 30, 2019**

## MEMORANDUM OPINION

This action involves a dispute over a settlement agreement that resolved a previous lawsuit between the parties. In that case, a consulting company, Needham Business Consulting, PA, LLC (hereinafter "Needham Consulting"), alleged that an insurance claims-review business to which it provided consulting services, Claim Doc LLC (hereinafter "Claim Doc"), misappropriated its trade secrets.

To settle that case, the parties agreed to a mutual release of claims and provided that Claim Doc would pay Needham Consulting $370,000 in installments. In turn, Needham Consulting was prohibited from contacting Claim Doc's customers to persuade them to switch to a competitor, and was required to erect a "Chinese Wall" to prevent such contact with one of these customers.

Claim Doc has brought this action, alleging that Needham Consulting breached the settlement agreement by encouraging one of Claim Doc's customers to switch to a competitor, and by failing to establish the Chinese Wall required by the settlement agreement. Needham

Consulting has counterclaimed, alleging that Claim Doc has failed to make the required payments, and reasserting the allegations of trade secret misappropriation raised in the previous lawsuit.

Pending before me are Claim Doc's motion to dismiss Needham Consulting's counterclaims and motion for partial summary judgment on its own breach of contract claim. For the reasons that follow, the motion to dismiss counterclaims will be granted in part and denied in part, and the motion for partial summary judgment will be denied.

## I.  FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken from the Complaint, Answer, and exhibits filed by the parties in conjunction with the motion for partial summary judgment. While several facts in this matter are disputed, the facts set out below are undisputed unless otherwise noted.

### A.  *The Previous Lawsuit and the Settlement Agreement*

Plaintiffs in this action are Claim Doc, LLC and its founder and managing principal, Ben Krambeck (referred to collectively hereinafter as "Claim Doc"). Claim Doc provides "claims review and auditing services to self-funded health [insurance] plans," such as those operated by employers. Defendants are Needham Business Consulting, PA, LLC, and its principal, David Fishbone (referred to collectively hereinafter as "Needham Consulting"). (Pls.' SOF ¶ 1, Defs.' SOF ¶ 1; Compl. ¶¶ 1-4; Answer ¶¶1-4.)

In 2013, Claim Doc and Needham Consulting entered into a consulting agreement, under which Needham Consulting agreed to provide consulting services, in exchange for a percentage of Claim Doc's gross revenues. By December 2015, a dispute arose between the parties, wherein Claim Doc initiated a private arbitration alleging that Needham Consulting breached the consulting agreement. Shortly thereafter, Needham Consulting filed an action in this Court, alleging that Claim Doc had, among other things, misappropriated its trade secrets. That action, which I refer

to hereinafter as the "Previous Lawsuit," was assigned to me. (Pls.' SOF ¶¶ 2-6, Defs.' SOF ¶¶ 2-6; <u>Needham Bus. Consulting PA, LLC v. Claim Doc, LLC</u>, No. 15-cv-6868 (E.D. Pa. filed Dec. 30, 2015).))

After Needham Consulting moved for a preliminary injunction in the Previous Lawsuit, I referred the matter to Magistrate Judge David R. Strawbridge for a settlement conference. This conference was held on March 10, 2016, and resulted in a settlement agreement that resolved both the Previous Lawsuit and the private arbitration. Accordingly, I dismissed the Previous Lawsuit pursuant to Local Rule of Civil Procedure 41.1(b). (Pls.' SOF ¶ 7; Defs.' SOF ¶ 7.)

The settlement agreement between the parties consists of three documents: (1) a "Settlement Term Sheet" (hereinafter the "Term Sheet"), (2) a "Mutual Release," and (3) a "Promissory Note." (Pls.' SOF ¶ 7; Defs.' SOF ¶ 7.)

The Term Sheet sets out the general terms of the settlement, three of which are relevant here. First, Claim Doc agreed to pay Needham Consulting $370,000, beginning with an immediate payment of $45,000, followed by monthly installment payments of $15,000.[1] The Term Sheet further provides that Claim Doc "shall execute a judgment note in the amount" of $370,000, which note "shall be held by the Court or a neutral escrow agent selected by agreement of the parties." (Pls.' SOF ¶ 8' Defs.' SOF ¶ 8; Compl., Ex. A ¶¶ 4, 9.)

Second, the parties agreed to execute a release of claims and "discontinue with prejudice" both the Previous Lawsuit and the arbitration. (Compl., Ex. A ¶¶ 1-2.)

And third, Needham Consulting agreed not to contact certain specified customers of Claim Doc to convince them to terminate their business with Claim Doc, and to establish a "Chinese Wall," preventing Needham Consulting from receiving information from one of those customers,

---

[1] The final installment payment being $10,000.

Wirerope Works, Inc. (hereinafter "Wirerope"), about Wirerope's choice of vendors for the coming year. This term was set out in Paragraph 6 of the Term Sheet:

> Commencing on March 10, 2016, Needham [defined in the Term Sheet to include both Needham Consulting and its principal, David Fishbone] shall have no contact, directly or indirectly, with Wirerope . . . for the purpose of convincing [it] to alter or terminate [its] relationship with Claim Doc, for the same duration as payments are made under the settlement term sheet. For purposes of satisfying its obligation to have no indirect contact with [Wirerope] for the purposes of convincing it to alter or terminate its relationship with Claim Doc, Needham shall establish a "Chinese Wall" to isolate itself from information about [Wirerope's] choices of vendors for the coming year. So long as Needham complies with this paragraph, the mere fact that [Wirerope] terminate[s] or change[s] [its] relationship with Claim Doc shall not constitute or give rise to a claim of breach of this paragraph. Failure of Claim Doc to renew [Wirerope] shall not in and of itself excuse future performance by Claim Doc.

The Term Sheet further provides that if Needham Consulting violates this paragraph, Claim Doc "shall have the right to cease all payments to Needham and Needham shall return all money paid to it under this settlement." However, before ceasing payments based on an alleged violation of this paragraph, the Term Sheet required Claim Doc to notify Needham Consulting and "participate in good faith" in a mediation before Judge Strawbridge. (Pls.' SOF ¶¶ 9-10; Defs.' SOF ¶¶ 9-10.)

### B. *The Current Law Suit Based on Needham Consulting's Alleged Contact With Wirerope*

Approximately two months after the parties entered into this settlement agreement, on May 11, 2016, Claim Doc and Wirerope terminated their business relationship.[2] Less than a week later, on May 16, 2016, Wirerope entered into an agreement to obtain its claims review and auditing services from one of Claim Doc's competitors, Claim Watcher, a company created, at least in part,

---

[2] The parties appear to dispute whether Claim Doc or Wirerope made the decision to terminate the relationship. (<u>Compare</u> Pls.' SOF ¶ 11, <u>with</u> Defs.' SOF ¶ 11.) While this fact is less than entirely clear in the record, it is not material here. What matters is *when* the relationship ended, and whether Needham Consulting communicated with Wirerope at any point *before* the relationship ended in an effort to convince Wirerope to end the relationship.

by Needham Consulting's principal, Defendant Fishbone. (Pls.' SOF ¶¶ 11, 18, 35; Defs.' SOF ¶¶ 11, 18, 35; 5/16/17 Dep. of David Fishbone (hereinafter "Fishbone Dep.") at 116:12-21.)

Soon after their business relationship ended, a dispute arose between Claim Doc and Wirerope, regarding Claim Doc's post-termination duties. While the substance of that dispute is not relevant here, it resulted in Wirerope bringing a lawsuit against Claim Doc in the United States District Court for the District of New Jersey (hereinafter, the "New Jersey Lawsuit"). In the New Jersey Lawsuit, Claim Doc counterclaimed against Wirerope, alleging that it had tortiously interfered with the settlement agreement between Claim Doc and Needham Consulting that Judge Strawbridge facilitated in the Previous Lawsuit. (Pls.' SOF ¶¶ 12, 15-16; Defs.' SOF ¶¶ 12, 15-16; INDECS Corp. v. Claim Doc, LLC, No. 16-cv-4421 (D.N.J. filed July 20, 2016.))

Discovery in the New Jersey Lawsuit touched on the termination of Wirerope's and Claim Doc's business relationship, as well as Wirerope's decision to initiate a relationship with Defendant Fishbone's competing company, Claim Watcher. That discovery included depositions of Defendant Fishbone, Plaintiff Krambeck, Wirerope's Chief Financial Officer, and others. This discovery led Claim Doc to conclude that Needham Consulting had breached the settlement agreement at issue here by: (1) indirectly contacting Wirerope days before Wirerope's and Claim Doc's relationship ended, in an effort to encourage Wirerope to switch to Defendant Fishbone's competing service, Claim Watcher; and (2) failing to establish the Chinese Wall required by the settlement agreement. (Pls.' SOF ¶ 17, Defs.' SOF ¶ 17; Pls.' Exs. B, F, H, M, O.)

After notifying Needham Consulting of the alleged breach, Claim Doc requested a mediation with Judge Strawbridge, as required by the settlement agreement. The mediation was held in August 2017, but was unsuccessful in resolving the dispute. Shortly thereafter, Claim Doc

brought this action claiming, among other things, breach of contract. (Pls.' SOF ¶¶ 36-38; Defs.' SOF ¶¶ 36-38.)[3]

### C. *Procedural History of this Action*

On October 24, 2017—shortly after bringing this suit, and before Needham Consulting answered—Claim Doc moved for leave under Federal Rule of Civil Procedure 67 to make the remaining settlement payments into this Court's registry, pending the outcome of this litigation. Claim Doc explained that, because its position in this litigation is that Needham Consulting's breach of the settlement agreement relieved it of its obligation to make the remaining payments, it should be permitted to make those payments into the Court's registry pending the outcome of the suit. I granted this motion but noted that my permitting Claim Doc to make such payments "in no way impacts the merits of any claims that have been brought, or will be brought, in this action, nor prevents any party from asserting any claims or seeking any relief." (10/27/17 Or.)

Thereafter, Needham Consulting answered Claim Doc's Complaint and asserted counterclaims, consisting of: (1) claims for breach of contract and unjust enrichment, based on Claim Doc's alleged failure to: (A) make settlement payments, and (B) deliver the Promissory Note that was executed as part of the settlement agreement to the Court or a neutral escrow agent; and (2) a claim under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, based on the same allegations of misappropriation of trade secrets alleged by Needham Consulting in the Previous Lawsuit.

Claim Doc has now moved to dismiss each of these counterclaims. As to the breach of contract and unjust enrichment counterclaims, Claim Doc argues that these claims fail because it has been making the required settlement payments into the Court's registry, and is not required to

---

[3] Claim Doc's Complaint in this action also includes claims for unjust enrichment and tortious interference with contractual relations, none of which are at issue here.

deliver the Promissory Note to the Court or an escrow agent. As to the counterclaim under the Defendant Trade Secrets Act, Claim Doc argues that the claim is barred by the Mutual Release executed as part of the settlement agreement, or by the doctrine of res judicata.

Claim Doc has also moved for partial summary judgment on its own breach of contract claim, contending that the discovery it obtained in the New Jersey Lawsuit establishes beyond genuine dispute that Needham Consulting breached the settlement agreement by contacting Wirerope to convince it to terminate its relationship with Claim Doc, and by failing to establish the required Chinese Wall.

For the reasons set out in detail below, I will grant in part and deny in part Claim Doc's motion to dismiss Needham Consulting's counterclaims, dismissing the trade-secrets counterclaim but not the breach of contract and unjust enrichment counterclaims.

As to Claim Doc's motion for partial summary judgment, the motion will be denied because there are genuine issues of material fact in dispute—specifically whether Needham Consulting indirectly contacted Wirerope in an effort to convince it to end its relationship with Claim Doc, and failed to establish the required Chinese Wall.

## II. ANALYSIS

### A. *Claim Doc's Motion to Dismiss Counterclaims*

### 1. Legal Standard

In evaluating a motion to dismiss counterclaims, a court must hold the counterclaims to the same pleading standards applied to complaints under Federal Rule of Civil Procedure 12(b)(6). RAH Color Techs. LLC v. Ricoh USA Inc., 194 F. Supp. 3d 346, 348 (E.D. Pa. 2016).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id. While it "does not impose a probability requirement at the pleading stage," plausibility does require "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of a claim." Phillips v. Cty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

To determine the sufficiency of a complaint under Twombly and Iqbal, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted). Courts must construe the allegations in a complaint "in the light most favorable to the plaintiff." Id. at 220.

In evaluating a motion to dismiss, courts generally consider only the allegations contained in the complaint, the exhibits attached thereto, and matters of public record. Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014); Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 567 (3d Cir. 2002). "[A] complaint may not be dismissed merely because it appears unlikely that [a] plaintiff can prove those facts or will ultimately prevail on the merits." Connelly v. Lane Const. Corp., 809 F.3d 780, 790-91 (3d Cir. 2016) (quoting Phillips, 515 F.3d at 231).

## 2. **Discussion**

Claim Doc has moved to dismiss each of Needham Consulting's counterclaims, advancing three arguments. First, Claim Doc argues that the counterclaims under the Defend Trade Secrets Act (Counts I and IV)[4] are barred by the mutual release of claims set out as part of the settlement agreement, or, alternatively, by the doctrine of res judicata. Second, Claim Doc contends that Needham Consulting's breach of contract and unjust enrichment counterclaims (Counts II and III), to the extent that these counterclaims are based on Claim Doc's alleged failure to make settlement payments, fail because Claim Doc has made the payments into the Court's registry. And third, Claim Doc argues that, to the extent the breach of contract counterclaim is based on its alleged failure to deliver the Promissory Note to the Court or an escrow agent, the counterclaim fails because it is not required to do so under the settlement agreement.

Each of these three arguments is addressed in turn. I agree with Claim Doc's first argument, and will dismiss the trade secret misappropriation counterclaims. However, I disagree with the second and third arguments, and, accordingly, will deny Claim Doc's motion to dismiss the breach of contract and unjust enrichment counterclaims.

### a. **Are the Counterclaims for Trade Secret Misappropriation Barred by the Settlement Agreement or the Doctrine of Res Judicata?**

Claim Doc argues that Needham Consulting's counterclaims for trade secret misappropriation must be dismissed because they are barred by the Mutual Release executed as part of the settlement agreement, or, alternatively, by the doctrine of res judicata. Needham

---

[4] Count I asserts a claim for "preliminary and permanent" injunctive relief, requesting that the Court enjoin Claim Doc from using Needham Consulting's trade secrets. However, an injunction is a form of relief, not a separate cause of action. See, e.g., Patel v. Patel, No. 18-cv-1841, 2018 WL 3642417, at *9 (E.D. Pa. Aug. 1, 2018) (dismissing a count for "Preliminary Injunction / Temporary Restraining Order" and treating the paragraphs set out in the count as a request for injunctive relief). Accordingly, Count I will be dismissed and the paragraphs set out therein treated as a request for injunctive relief based on the Defend Trade Secrets Act claim set out in Count IV.

Consulting responds that the counterclaims are not barred by the settlement agreement or res judicata, because the agreement provides that the release of claims is contingent upon Claim Doc making the required settlement payments. I agree with Claim Doc that these counterclaims were released by the settlement agreement, and will dismiss them.[5]

Where a party to a dispute has released a claim as part of a settlement agreement, and subsequently attempts to assert the released claim, a court may enforce the settlement agreement by dismissing the claim. See, e.g., Dugan v. O'Hara, 125 F. Supp. 3d 527, 536 (E.D. Pa. 2015) (dismissing the plaintiff's claims where the plaintiff previously entered into a settlement agreement releasing those claims); see also Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir. 1970) ("An agreement to settle a law suit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court . . . ."). Here, Needham Consulting does not appear to dispute that its counterclaims for trade secret misappropriation are within the scope of the Mutual Release.[6] Instead, Needham Consulting contends that the release is contingent upon Claim Doc upholding its end of the settlement agreement by making all required settlement payments, and that, because Claim Doc has failed to do so, Needham Consulting may reinstitute these claims.

---

[5] Accordingly, I need not reach the question of whether the counterclaims are barred by res judicata.

[6] Needham Consulting argues that the *doctrine of res judicata* could not apply to its trade secret misappropriation claim, because the claim is brought under the Defend Trade Secrets Act, a federal statute that was not enacted until after the settlement agreement was executed. (See Defs.' Mem. in Opp'n 7.) However, Needham Consulting does not contend that *the language of the Mutual Release* does not extend to such a claim, and for good reason: the Mutual Release provides a release for "any and all claims . . . which any of them ever had, now has *or hereinafter may have* against one another . . . arising out of or in any way related to the [Previous Lawsuit]." (Compl., Ex. B (emphasis added).)) Thus, the release extends to the trade secret misappropriation claim notwithstanding the fact that the claim is brought under the subsequently enacted Defend Trade Secrets Act.

Because settlement agreements are contracts, whether a party's release of claims in a settlement agreement is contingent on the other party's performance of the agreement is a question of contract interpretation, governed by principles of state contract law. See, e.g., Coia v. Vanguard, No. 16-cv-3579, 2017 WL 724334, at *11 (E.D. Pa. Feb. 23, 2017). Under Pennsylvania law,[7] a party may not reinstitute released claims "if the consideration for [the] release of claims consists of only the *promise* to perform, which is unfulfilled" by the other party. Id. (emphasis added) (citing Polish Am. Mach. Corp. v. R.D. & D. Corp., 760 F.2d 507, 511 (3d Cir. 1985)). Rather, in such a case, the releasing party's "proper remedy would be a suit sounding in breach of contract." Id. By contrast, "if the consideration of a release of claims consists of *performance* of the settlement agreement," then the releasing party may reinstitute the claims if the other party has failed to substantially perform its obligations. Id. (emphasis added).

In Coia, for example, the plaintiff argued that she could assert certain employment discrimination claims despite executing a release of those claims as part of a settlement agreement with her employer, because the employer had allegedly breached the settlement agreement. See 2017 WL 724334, at *11. The court rejected this argument, finding that because the employer's *promise* to perform supplied the consideration for the release of the plaintiff's claims, the plaintiff was barred from bringing those claims, notwithstanding her allegation that her employer breached the settlement agreement. See id.

Accordingly, I must determine, based on the language of the settlement agreement at issue here, whether the consideration for the release of claims consisted merely of a *promise* to perform, or whether the consideration was performance itself. To do so, I must consider "the intent of the parties as manifested in the language of the settlement agreement." Coia, 2017 WL 724334, at *11.

---

[7] The parties do not dispute the applicability of Pennsylvania law, as the Term Sheet includes a choice of law clause providing that it is to be "interpreted according to Pennsylvania law." (Compl., Ex. A ¶ 10.)

A review of the relevant language of the documents executed as part of the settlement agreement—the Mutual Release and the Term Sheet—reveals that the consideration for the parties' release of claims consisted of their mutual *promises* to perform, not performance itself. Perhaps most importantly, the opening sentence of the Mutual Release states that the consideration is "the execution and delivery of the Settlement Term Sheet by and among [Needham Consulting], on the one hand, and [Claim Doc], on the other hand, intending to be legally bound . . . ." (Compl., Ex. B.) Such language—as opposed, for example, to language describing the consideration as "the payment of $370,000," or "the performance of obligations set out in the Term Sheet"—suggests that it is the *promise* of performance, and not the performance itself, that constitutes the consideration.

Moreover, the remainder of the Mutual Release contains no conditional language, but rather provides that the parties, "absolutely, unconditionally[,] and irrevocably release, waive, relinquish, renounce[,] and discharge" the claims described therein. (Compl., Ex. B.) Likewise, the first paragraph of the Term Sheet contains no conditional language, but rather provides that the Previous Lawsuit, in which Needham Consulting asserted claims for misappropriation of trade secrets, "shall be discontinued *with prejudice*." (Compl., Ex. A ¶ 1 (emphasis added.)) And the first sentence of the third paragraph of the Term Sheet again reveals the parties' intent to *unconditionally* release all claims, providing that neither party "shall have any claims under [the consulting agreement] that survive this settlement term sheet." (Id. ¶ 3.)

The unconditional language described above stands in stark contrast to releases that courts have found to be contingent on performance. See, e.g., Capek v. Mendelson, 821 F. Supp. 351 (E.D. Pa. 1993) (holding that the consideration for a release of claims in a settlement agreement was "actual payment of the settlement amount, not a simple promise to pay," where the settlement

agreement provided that if the funds were not fully paid "there would be no settlement"); <u>Melendez v. Horizon Cellular Tele. Co.</u>, 841 F. Supp. 687, 691 n.8 (E.D. Pa. 1994) (concluding that "the consideration for [the plaintiff's] relinquishment of his earlier . . . claims was [the defendant's] performance . . . and not simply the making of the promises," where the settlement agreement provided that the release was made "in exchange for the satisfactory *fulfillment* . . . of the promises contained in [the settlement agreement]" (emphasis added)).

In contending that the release of claims is contingent upon Claim Doc making all required settlement payments, Needham Consulting relies on a single clause within the third paragraph of the Term Sheet. That paragraph, with the relevant clause italicized, is set out below:

> The Consulting Agreement . . . is terminated, and no party to the Consulting Agreement shall have any claims under it that survive this settlement term sheet. For purposes of clarity, and not by way of limitation, Needham does not have any claim that Claim Doc possesses or is using any intellectual property (including trade secrets or confidential information) belonging to Needham, *provided that Claim Doc makes all payments set forth in paragraph 4.*

(Compl., Ex. A. ¶ 3 (emphasis added.))

Needham Consulting's position—that the italicized language above renders the release of claims contingent on Claim Doc making settlement payments—is unpersuasive for two reasons. First, it is a single clause within a single sentence that itself purports to be a mere "clari[fication]" of the unconditional language that precedes it. Second, the manifest purpose of that sentence is not to provide a *condition* for the release of claims, but rather to clarify what the released claims *include*: a claim for trade secret misappropriation. If the parties had intended to substantially alter the effect of the release by making it conditional, this intent would be manifested through more than a single clause within an unrelated sentence. Accordingly, this clause—referenced nowhere else in either the Term Sheet or the Mutual Release—does not outweigh the other unconditional language discussed above.

Because the consideration for the release of claims set out in the Mutual Release and the Term Sheet was the mere *promise* to perform, and not performance itself, Needham Consulting may not reinstitute its released claims for trade secret misappropriation, notwithstanding its allegation that Claim Doc has breached the settlement agreement by failing to make payments. Rather, Needham Consulting's remedy is a counterclaim for breach of the settlement agreement— which it has asserted. Accordingly, Needham Consulting's trade secret misappropriation counterclaims will be dismissed.

### b. Do the Breach of Contract and Unjust Enrichment Counterclaims Fail Because Claim Doc Has Deposited the Settlement Payments in the Court's Registry?

Needham Consulting's breach of contract and unjust enrichment counterclaims are premised, in part, on Claim Doc's alleged failure to make the required settlement payments. Claim Doc argues that these counterclaims fail because it has made all required settlement payments into the Court's registry, after obtaining the Court's permission to do so under Federal Rule of Civil Procedure 67. Needham Consulting responds that payments to the Court under Rule 67 do not prevent them from asserting counterclaims for failure to pay. I agree with Needham Consulting, and Claim Doc's motion to dismiss these counterclaims will be denied.

Federal Rule of Civil Procedure 67(a) provides in relevant part:

> If any part of the relief sought is a money judgment or the disposition of a sum of money or some other deliverable thing, a party—on notice to every other party and by leave of court—may deposit with the court all or part of the money or thing, whether or not that party claims any of it.

While there are relatively few decisions discussing Rule 67, courts have noted that "the rule's purpose is to relieve the depositor of responsibility for [a] fund in dispute while the parties hash out their difference with respect to it." <u>Cajun Elec. Power Co-op., Inc.</u>, 901 F.2d 441, 444-445 (5th Cir. 1990). Claim Doc was permitted to do exactly that by depositing the settlement

payments into the Court's registry for safekeeping while litigating its position that it is entitled to keep these funds due to Needham Consulting's breach. Nothing in Rule 67, however, provides that a court's acceptance of disputed funds into its registry precludes any party from asserting a claim against the depositing party based on those funds.

Moreover, several courts have cautioned against applying Rule 67 in a way that would alter the contractual rights that the parties bargained for, including by depriving a party of its cause of action for breach of contract. See Progressive Cas. Ins. Co. v. Drive Trademark Holdings LP, 680 F. Supp. 2d 639, 640-42 (D. Del. 2010) (collecting cases standing for the proposition that "Rule 67 should not be used as a means to alter the contractual relationships and legal duties of the parties; rather, it should be used as a procedural device to provide a place of safekeeping for disputed funds."). In Progressive, the plaintiffs sought to deposit a payment scheduled to be paid to the defendants under a licensing agreement, which agreement the plaintiffs maintained the defendants had breached. 680 F. Supp. 2d at 640. The court denied the motion, noting the defendants' objection that the plaintiffs were attempting to use Rule 67 to "shield [themselves] from potential liability" under the licensing agreement rather than using the rule merely for safekeeping purposes. Id. at 640-641.

Aware of this exact concern, I granted Claim Doc's motion to deposit funds, over Needham Consulting's objection, with the explicit caveat that my granting the motion would "in no way impact[] the merits of any claims that have been brought, or will be brought, in this action, nor prevent[] any party from asserting any claims or seeking any relief." (10/27/17 Or.) Thus, while Claim Doc sought and obtained leave to make the payments into this Court's registry, Needham Consulting is not precluded from asserting counterclaims for breach of contract or unjust

enrichment based on Claim Doc's failure to make payments. Accordingly, Claim Doc's motion to dismiss Needham Consulting's counterclaims on this basis will be denied.

### c. Does Claim Doc Have a Duty Under the Settlement Agreement to Deliver the Promissory Note to the Court or an Escrow Agent?

Needham Consulting's breach of contract counterclaim is also premised on Claim Doc's alleged failure to deliver to the Court or to an escrow agent the Promissory Note that Claim Doc executed as part of the settlement agreement. Claim Doc responds that the settlement agreement does not impose a duty to deliver the note.

Paragraph 9 of the Term Sheet provides that "Claim Doc LLC shall execute a judgment note in the amount of the payments in paragraph 4. The judgment note shall be held by the Court or a neutral escrow agent selected by agreement of the parties." (Compl., Ex. A ¶ 9.) Claim Doc contends that while this provision requires it to *execute* the judgment note, the provision is silent as to who is required to *deliver* the note to the Court or to a neutral escrow agent, providing only that it "shall be held" by the Court or the neutral escrow agent.

"While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." <u>Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.</u>, 905 A.2d 462, 469 (Pa. 2006). Because this provision of the Term Sheet is ambiguous as to who is required to deliver the Promissory Note to the Court or a neutral escrow agent, Needham Consulting's breach of contract counterclaim—premised on its interpretation of the Term Sheet as imposing this duty on Claim Doc—may not be dismissed on a Rule 12(b)(6) motion. Accordingly, Claim Doc's motion to dismiss the breach of contract counterclaim on this basis will be denied.

**B. *Claim Doc's Motion for Partial Summary Judgment***

In addition to moving to dismiss Needham Consulting's counterclaims, Claim Doc has also moved for partial summary judgment on its own breach of contract claim. While no discovery has been taken in this action, Claim Doc contends that, based on the discovery in the New Jersey Lawsuit, there is no genuine dispute of material fact, and that it can establish, as a matter of law, that Needham Consulting breached the settlement agreement. Needham Consulting responds that the record from the New Jersey Lawsuit does not establish, as a matter of law, that Needham Consulting breached the settlement agreement. Needham Consulting also urges that additional discovery is needed to fully respond to Claim Doc's motion.

For the reasons discussed below, I agree with Needham Consulting that the discovery from the New Jersey Lawsuit does not establish beyond genuine dispute that it breached the settlement agreement. Accordingly, Claim Doc's motion for partial summary judgment will be denied.

**1. <u>Legal Standard</u>**

A party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact in dispute, and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment has been made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

An issue is "genuine" if a reasonable jury could rule in favor of the non-moving party based on the evidence presented. <u>Kaucher v. Cnty. of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006). A factual dispute is "material" if it might affect the outcome of the suit under the appropriate governing law. <u>Id.</u> at 423. The non-moving party cannot avert summary judgment with speculation or conclusory

allegations, but rather must cite to the record. <u>Ridgewood Bd. of Educ. v. N.E. for M.E.</u>, 172 F.3d 238, 252 (3d Cir. 1999); Fed. R. Civ. P. 56(c).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in [its] favor.'" <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004) (quoting <u>Anderson</u>, 477 U.S. at 255).

## 2. <u>Discussion</u>

In order to prevail on its breach of contract claim, Claim Doc must identify undisputed facts that establish three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." <u>CoreStates Bank, N.A. v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). Needham Consulting does not dispute the first and third elements—that the settlement agreement is a contract, or that, assuming there was a breach of the agreement, Claim Doc suffered damages. Rather, Needham Consulting maintains that there are disputed facts material to the second element—whether there was a breach—thus precluding summary judgment. For the following reasons, I agree with Needham Consulting, and, accordingly, will deny Claim Doc's motion.

Claim Doc contends that Needham Consulting breached the settlement agreement in two ways: (1) by indirectly contacting Wirerope for the purpose of convincing it to terminate its relationship with Claim Doc; and (2) by failing to establish a Chinese Wall to prevent contact with Wirerope.

### a. Needham Consulting's Alleged Indirect Contact with Wirerope

Paragraph 6 of the Term Sheet sets out Needham Consulting's duty to refrain from contacting Wirerope for the purpose of convincing it to terminate its relationship with Claim Doc, providing in relevant part:

> Commencing on March 10, 2016, Needham shall have no contact, directly or indirectly, with Wirerope . . . for the purpose of convincing [it] to alter or terminate [its] relationship with Claim Doc, for the same duration as payments are made under the settlement term sheet. . . . So long as Needham complies with this paragraph, the mere fact that [Wirerope] terminate[s] or change[s] [its] relationship with Claim Doc shall not constitute or give rise to a claim of breach of this paragraph. Failure of Claim Doc to renew [Wirerope] shall not in and of itself excuse future performance by Claim Doc.

(Compl., Ex. A ¶ 6.) Thus, to breach this provision, Needham Consulting would have to: (1) contact Wirerope, directly or indirectly; and (2) do so for the purpose of convincing Wirerope to alter or terminate its relationship with Claim Doc.[8]

Claim Doc contends that there is no genuine dispute that Needham Consulting indirectly contacted Wirerope to convince it to terminate its relationship with Claim Doc and switch to Defendant Fishbone's competing service, Claim Watcher. In support of its position, Claim Doc points to a letter sent to Wirerope's Chief Financial Officer, Harold Kropp, on May 6, 2016, by a person named Mike Shine, President of a company called INDECS. This company provided "claims administrative services" to Wirerope pursuant to a three-party agreement between Claim Doc, IDECS, and their mutual customer, Wirerope. (Pls.' Exs. I, N; see also Deposition of Mike Shine (hereinafter "Shine Dep.") at 157:23-158:21.).

---

[8] Because a communication by Needham Consulting does not constitute a breach unless it is intended to convince Wirerope to alter or terminate its relationship with Claim Doc, a communication is not a breach if it occurs *after* that relationship has already ended. Thus, potential breaches include only those communications that occurred before Claim Doc's and Wirerope's relationship terminated on May 11, 2016.

The May 6, 2016, letter from Shine contains a section headed "INDECS Renewal Option," which provided, in part, as follows:

INDECS Renewal Option

As you requested, if you moved to *Claim Watcher*, from Claim DOC be assured of the following:

- The percentage on audited claims will be 10% rather than the 12% that Claim DOC charged. Given the contracts in place, I believe that the overall costs will be significantly reduced from what was paid to Claim DOC.
- In addition, *Claim Watcher* and INDECS will review the fees paid by Wirerope . . . for any audits, from the renewal on 6/1/16 to a possible renewal on 1/1/17, to see if any adjustments or rebates can be considered for Wirerope . . . as we avoid legal fees.

 (Pl.'s Ex. N.)

Claim Doc contends that Shine's May 6, 2016, letter to Wirerope "extolled the benefits of moving from Claim Doc to Claim Watcher," and thus was intended to convince Wirerope to terminate its relationship with Claim Doc. (Pl.'s Mem. in Supp. 15.) But even if that is true beyond any genuine dispute,[9] that alone is not enough to establish a breach of the settlement agreement,

---

[9] I note that Shine testified at deposition that he did not specifically intend to persuade Wirerope to terminate its relationship with Claim Doc, but rather merely hoped to keep Wirerope as a customer of *INDECS*, regardless of whether that involved Wirerope switching to Claim Watcher or staying with Claim Doc. Shine testified as follows:

> Q.: So you didn't have any inclination until mid or late May of 2016 that [Wirerope CFO] Harold [Kropp] was going to replace Claim Doc with Claim Watcher?
>
> A.: I had no – my inclination was he was going to get rid of them because he didn't like [Claim Doc principal] Ben [Krambeck] and didn't trust him and the people were not responsive. Did I know he going to move to Claim Watcher? I didn't know that. I was hoping to hold onto them, whether through an Aetna program – and Aetna wouldn't quote on it – or some other way. But if the only way we could hold onto them was by moving to Claim Watcher, then I would hold onto them and move them to Claim Watcher.

(Shine Dep. at 147:14-148-2.) I need not determine whether Shine's testimony creates a genuine dispute of fact as to whether the purpose of the May 6, 2016, letter was to convince Wirerope to terminate its

because Claim Doc does not contend that Shine is an employee or agent of Needham Consulting or Defendant Fishbone individually—or is, in any other way, a party to the settlement agreement. Rather, to establish a breach, Claim Doc must prove that Shine's letter was an indirect communication from Defendant Fishbone, who *is* a party to the settlement agreement. In other words, Claim Doc must prove that Defendant Fishbone directed Shine to send this letter.

Needham Consulting urges that there is a genuine dispute of fact as to whether Defendant Fishbone directed Shine to send this letter. I agree.

Defendant Fishbone was deposed in the New Jersey Lawsuit, testifying as follows:

Q.: . . . Did you ever talk to Mike Shine about Wirerope joining Claim Watcher?

A.: No, not until he told me that they were going to do it.

Q.: When was that?

A.: That was again around – it may have been the last week of May or early June – the first week of June. I don't remember the exact date.

(Fishbone Dep. at 117:15-24.)

Thus, according to Defendant Fishbone's testimony, he did not speak to Shine about Wirerope switching from Claim Doc to Claim Watcher before Shine sent the May 6, 2016, letter— nor at any time between the execution of the settlement agreement in March 2016, and the termination of Wirerope's and Claim Doc's relationship on May 11, 2016. Rather, according to Defendant Fishbone's testimony, he did not speak to Shine about Wirerope's decision to switch to Claim Watcher until "the last week of May or early June"—*after* Claim Doc's and Wirerope's relationship had already terminated.

---

relationship with Claim Doc, because, as discussed below, there is a genuine dispute of fact regarding whether this letter was an indirect communication from Defendant Fishbone.

On a motion for summary judgment, where the evidence must be viewed in the light most favorable to Needham Consulting as the non-moving party, I must credit this testimony. See Marino, 358 F.3d at 247 (holding that, on a motion for summary judgment, "the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in [its] favor" (internal quotation marks omitted)). If believed, the testimony belies Claim Doc's argument that the May 6, 2016, letter from Shine was an indirect communication from Defendant Fishbone.

Claim Doc offers no persuasive explanation as to why Defendant Fishbone's testimony fails to create a genuine dispute of fact that precludes summary judgment. Instead, Claim Doc appears to invite me to improperly discredit the testimony, offering a chain of circumstantial evidence that supports its position that the May 6, 2016, letter from Shine was, in fact, sent at the behest of Defendant Fishbone. Whether or not this evidence would prove convincing to the finder of fact, it is unavailing to Claim Doc on summary judgment.

Specifically, Claim Doc argues that the May 6, 2016, letter offers Wirerope the rates it would pay for Claim Watcher's services and that this information could only have come from Defendant Fishbone. In support of this position, Claim Doc points to Shine's deposition testimony about who provided this rate information. At first, Shine testified that Defendant Fishbone was among three people with whom Shine spoke in order to obtain this information—the other two being Tom Knox and Vince Sobocinski, whose exact relationship with Defendant Fishbone and Needham Consulting is less than clear in the record.[10] But immediately thereafter, Shine corrected

_____

[10] Tom Knox is a consultant for whom Defendant Fishbone has worked for nearly twenty years. (See Fishbone Dep. at 19:24-21:24.) Claim Doc also contends in its statement of facts that Knox is the owner of INDECS, and was involved in the creation of Claim Watcher, though no record citations are provided in support of these assertions. (See Pls.' SOF ¶¶ 11, 26.) I note, however, that Shine testified that Knox is the "owner" of Claim Watcher. (Shine Dep. at 162:3-5.)

himself—eliminating Defendant Fishbone from this group of three, before ultimately settling on just one source for the information, Vince Sobocinski. Shine's nebulous testimony on this point is as follows:

> Q. And then the first bullet point [of the "INDECS Renewal Option" section of the May 6, 2016, letter, discussing Claim Watcher's 10 percent rate] – first of all, where did this information come from?
>
> A. I talked with Tom [Knox] and [Defendant] David [Fishbone] and Vince [Sobocinski] – Tom and Vince about what – because Claim – Wirerope felt that they were paying too much money to pay 12 percent. So they said we'll get a lower one. So I took that back to Vince and said, Vince, they think that they're paying too much money. Can we do 10 percent? And they agreed to it.
>
> Q. Okay. Who is Vince?
>
> A. Vince Sobocinski is the president of Homestead.
>
> Q. Okay. So you took this back to Tom and David and Vince and you –
>
> A. Tom – I really took it to Vince, who is in charge – he's the president of Homestead that does all sales.

(Shine Dep. 158:4-21.).

Notwithstanding Shine's ultimate testimony—that Vince Sobocinski, not Defendant Fishbone, provided the Claim Watcher rate information that ended up in the May 6, 2016, letter—Claim Doc argues that Shine must have, in fact, obtained this information from Defendant Fishbone, deducing this by process of elimination from: (1) Tom Knox's deposition testimony that he was not involved "in any way with putting together" the proposed rate; and (2) the fact that Vince Sobocinski works for a company called Homestead, not Claim Watcher. (See Shine Dep. 158:4-21; Knox Dep. 100:15-101:2.) Claim Doc further argues that its conclusion is supported by Tom Knox's testimony that Shine "probably talked" to Defendant Fishbone to obtain the rate

---

The record reveals even less about Vince Sobocinski: that he was President of a company called "Homestead," which "does all sales," and that he worked for Tom Knox. (Shine Dep. at 158:14-21, 161:18-23.)

information that went into the letter, because "they talk to each other on a regular basis, those two." (Knox Dep. at 103:1-14.)

At issue here is not whether this testimony—or any of the other circumstantial evidence put forward by Claim Doc—presents a *strong case* for the finder of fact to conclude that Defendant Fishbone directed Shine to send the May 6, 2016, letter to Wirerope. The current issue before me is whether this evidence establishes the matter *beyond any genuine dispute*. The fact remains that Defendant Fishbone, whose testimony I must credit as the non-moving party, testified that he did not "talk to Mike Shine about Wirerope joining Claim Watcher" before Shine sent the May 6, 2016, letter. Accordingly, Claim Doc's motion for partial summary judgment as to this alleged breach of the settlement agreement will be denied.

### b. Needham Consulting's Alleged Failure to Establish a Chinese Wall

Claim Doc also contends that Needham Consulting breached its duty under the settlement agreement to erect a Chinese Wall that would prevent contact with Wirerope about its "choice of vendors for the coming year." This duty is set out in Paragraph 6 of the Term Sheet as follows:

> For purposes of satisfying its obligation to have no indirect contact with [Wirerope] for the purposes of convincing it to alter or terminate its relationship with Claim Doc, Needham shall establish a "Chinese Wall" to isolate itself from information about [Wirerope's] choices of vendors for the coming year.

The term "Chinese Wall" is not defined in Paragraph 6, and nothing else in the settlement agreement details what specific actions Needham Consulting was required to take in order to "isolate itself from information about [Wirerope's] choices of vendors for the coming year."

In his deposition in the New Jersey Lawsuit, Defendant Fishbone testified about what actions he took to establish the required Chinese Wall:

> Q. Can you tell me what you did to establish the Chinese Wall?
>
> A. Sure. When I came back to [sic, read as "from"] court, I told Tom Knox, Bill Green, George Awad and Mike Shine that I settled my lawsuit and that I was not

to have any contact at all with the three entities that are listed in that paragraph [which include Wirerope], and for them to make sure that no one in any of the companies, Indecs or in our office with Knox, contacted or did anything with me regarding those three entities.

Q. Did you do anything else?

A. No, because I never got any contacts from anyone about anything. I got one e-mail that someone sent me from outside, which I sent on to Mike Shine and said tell this person not to contact me anymore. And he did and I never heard from him again.

(Fishbone Dep. at 114:4-19.)

Claim Doc argues that, even if Defendant Fishbone did what he testified to doing to establish the Chinese Wall, that, as a matter of law, is not enough.

As noted above, "[w]hile unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." Ins. Adjustment Bureau, Inc, 905 A.2d at 469. And when an ambiguity exists, "parol evidence is admissible to explain or clarify or resolve the ambiguity." Id. at 468.

Here, there can be little doubt that the term "Chinese Wall" is ambiguous, as it is both undefined in the settlement agreement, and lacks a precise meaning outside of specific fields such as the practice of law or securities trading.[11] Thus, parol evidence is admissible to give meaning to the term. Yet, Claim Doc points to no evidence in the record as to the parties' mutual understanding of what specific actions on the part of Needham Consulting were required to adequately establish the Chinese Wall.

---

[11] Compare Oxford English Dictionary Online, available at http://www.oed.com/view/Entry/31770?redirectedFrom=Chinese+Wall (last accessed January 28, 2019) (providing two definitions of "Chinese wall," one figurative: "an insurmountable barrier (to understanding, etc.)," the other in the context of a "Stock Exchange": "a prohibition against the passing of confidential information from one department of a financial institution to another"); with Black's Law Dictionary 274, 632 (9th ed. 2009) (defining "Chinese wall" by reference to "ethical wall" as "[a] screening mechanism maintained by an organization, esp. a law firm, to protect client confidences from improper disclosure to lawyers or staff who are not involved in a particular representation").

Accordingly, Claim Doc's motion for partial summary judgment as to this alleged breach will be denied.

### III.      <u>CONCLUSION</u>

For the reasons set out above, Claim Doc's motion to dismiss Needham Consulting's counterclaims will be granted in part and denied in part. While Needham Consulting's counterclaims for trade secret misappropriation will be dismissed, its counterclaims for breach of contract and unjust enrichment survive Claim Doc's motion to dismiss.

Claim Doc's motion for partial summary judgment on its breach of contract claim will be denied.

An appropriate Order follows.