**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BEN KRAMBECK and** : | |
| **CLAIM DOC, LLC.,** : | |
| : | |
| *Plaintiffs*, : | **CIVIL ACTION** |
| : | |
| : | |
| **v.** : | **No. 17 - 3934** |
| : | |
| **NEEDHAM BUSINESS CONSULTING** : | |
| **PA, LLC and DAVID FISHBONE** : | |
| : | |
| *Defendants.* : | |
| : | |

**Goldberg, J.**                                          **November 30, 2021**

## MEMORANDUM OPINION

The dispute between these parties has been ongoing since 2015, and involves a complicated, failed three-way business relationship for auditing claims submitted to an employer-sponsored health insurance plan. Currently, Plaintiffs have sued Defendants for common law breach of contract, tortious interference with a contract, and unjust enrichment. The breach of contract and unjust enrichment claims pertain to the alleged breach of a settlement agreement of a trade-secrets case previously filed and settled in this Court. The tortious interference claim alleges a scheme to withhold fees owed Plaintiffs for their auditing work.

Defendants now seek summary judgment on all claims, arguing that issue preclusion and the recent grant of summary judgment in a related District of New Jersey case compel dismissal of all claims. With respect to the contract claim, Defendants additionally seek judgment based on Plaintiffs' alleged waiver. Defendants also assert that there is insufficient evidence to sustain the

tortious interference claim.

For the following reasons, Defendants' Motion for Summary Judgment will be denied in most respects but granted only as to the unjust enrichment claim.

## I.      FACTUAL AND PROCEDURAL HISTORY

The following facts are undisputed unless otherwise noted.[1]

### A.      The Parties and Their Business Relationship

Plaintiffs are Claim Doc, LLC and its founder and managing principal, Ben Krambeck (collectively "Claim Doc"). Claim Doc provides "claims review and auditing services to self-funded health [insurance] plans," such as those operated by employers. Defendants are Needham Business Consulting, PA, LLC, and its principal, David Fishbone (collectively "Needham"). (DSUF ¶ 30; PC ¶¶ 1-2.)

INDECS Corp. ("INDECS"), not a party to this lawsuit, is a business that administers health plans for private employers. In June 2015, nonparty Wirerope Works, Inc., a manufacturing company, hired INDECS as its plan administrator, and the two companies jointly agreed to use Claim Doc as their claim auditor. Those three companies—INDECS, Wirerope, and Claim Doc— memorialized their relationship in a three-way contract titled the "Joinder Agreement." (PC ¶ 10; Pls.' Ex. H.)

### B.      The Underlying Settled Lawsuit

In 2013, Needham and Claim Doc entered into an agreement under which Needham provided consulting services to Claim Doc in exchange for compensation. (DSUF ¶ 31; PC ¶ 2.) The parties had a falling out in September of 2015 that ended their relationship. (PC ¶ 3; Pls.' Ex.

---

[1] References to the parties' filings will be made as follows: Defendants' Statement of Undisputed Facts ("DSUF"); Plaintiffs' Response to Defendants' Undisputed Facts ("PRUF"); and Plaintiffs' Counterstatement of Material Facts ("PC").

B at 19-20.) In December 2015, Claim Doc initiated private arbitration alleging Needham breached the consulting agreement. (PC ¶ 4.) Shortly thereafter, Needham filed an action in this Court, claiming that Claim Doc had, among other things, misappropriated its trade secrets. (DSUF ¶ 33; PC ¶ 5.) That action, which I will refer to as the "Previous Lawsuit," was assigned to me. See Needham Bus. Consulting PA, LLC v. Claim Doc, LLC, No. 15-cv-6868 (E.D. Pa. filed Dec. 30, 2015). A settlement conference held before Magistrate Judge Strawbridge on March 10, 2016 resulted in a settlement agreement. (DSUF ¶ 33; PC ¶ 6; Pls.' Ex. A.)

### C.      The Settlement Agreement

To settle the Previous Lawsuit, the parties agreed to a mutual release of claims which provided that Claim Doc pay Needham $370,000 in installments. (DSUF ¶ 34; PC ¶ 7.) In turn, Needham was prohibited from contacting Claim Doc's customers to persuade them to switch to a competitor, and was also required to erect a "Chinese Wall" to prevent such contact with Wirerope in particular. (Pls.' Ex. A.)

The settlement agreement, executed on March 10, 2016, consists of three documents: (1) a "Settlement Term Sheet" (the "Term Sheet"), (2) a "Mutual Release," and (3) a "Promissory Note." (DSUF ¶ 33-36; PC ¶ 6; Pls.' Ex. A.)

The Term Sheet sets out the general terms of the settlement, three of which are relevant here. First, Claim Doc agreed to pay Needham $370,000, with an immediate payment of $45,000, followed by monthly installments of $15,000. The Term Sheet further provided that Claim Doc "shall execute a judgment note in the amount" of $370,000, which "shall be held by the Court or a neutral escrow agent selected by agreement of the parties." (Pls.' Ex A ¶¶ 4, 9.)

Second, the parties agreed to execute a release of claims and "discontinue with prejudice" both the Previous Lawsuit and the arbitration. (Pls.' Ex A ¶¶ 1-2.) And third, Needham agreed not to contact certain specified customers of Claim Doc in an attempt to convince them to terminate

3

their business with Claim Doc. Needham also agreed to establish a "Chinese Wall" to prevent

Needham from receiving information regarding Wirerope in particular. (DSUF ¶ 34; PC ¶ 8.) This

term was set out in Paragraph 6 of the Term Sheet:

> Commencing on March 10, 2016, Needham [defined to include both
> Needham Consulting and its principal, David Fishbone] shall have
> no contact, directly or indirectly, with Wirerope … for the purpose
> of convincing [it] to alter or terminate [its] relationship with Claim
> Doc, for the same duration as payments are made under the
> settlement term sheet. For purposes of satisfying its obligation to
> have no indirect contact with [Wirerope] for the purposes of
> convincing it to alter or terminate its relationship with Claim Doc,
> Needham shall establish a "Chinese Wall" to isolate itself from
> information about [Wirerope's] choices of vendors for the coming
> year. So long as Needham complies with this paragraph the mere
> fact that [Wirerope] terminate[s] or change[s] [its] relationship with
> Claim Doc shall not constitute or give rise to a claim of breach of
> this paragraph. Failure of Claim Doc to renew [Wirerope] shall not
> in and of itself excuse future performance by Claim Doc.

(Pls.' Ex. A ¶ 6.)

The Term Sheet further provided that if Needham violated the above paragraph, Claim Doc

"shall have the right to cease all payments to Needham and Needham shall return all money paid

to it under this settlement." (Id. ¶ 8) Before ceasing payments based on an alleged violation of this

paragraph, the Term Sheet required Claim Doc to notify Needham and participate in mediation

before Judge Strawbridge. (Id.)

### D.    Needham's Alleged Breach of the Settlement Agreement

Just two months after the Previous Lawsuit was settled, Claim Doc accused Needham of

breaching the Term Sheet by soliciting Wirerope indirectly through INDECS. In a letter dated May

3, 2016, counsel for Claim Doc notified counsel for Needham of an alleged breach of the Term

Sheet, citing to a "writing from Mary Catherine Person … [in which] Mr. Fishbone and Tom Knox

[of INDECS] visited with her to propose that she participate in their plan to move the business of

Wirerope Works to [Fishbone's Company] Claim Watch[er]." (Defs.' Ex. K.) Claim Doc also

informed Needham that the letter qualified as "notice under Paragraph 8 of the Settlement Term Sheet." (Id.) Despite alleging breach of the Term Sheet on May 3, 2016, Claim Doc paid the monthly settlement payment of $15,000.00 to Needham on May 24, 2016. (Defs.' Ex. R; PC ¶ 40.)

A few weeks later, on June 30, 2016, Claim Doc's counsel sent a second letter to Needham's counsel reasserting breach of the Term Sheet. (Defs.' Ex. M.) Yet, Claim Doc continued to pay the installments set forth in the Term Sheet, and did so for approximately fourteen months despite Claim Doc's 2016 breach allegations. (Defs.' Ex. R.; PC ¶¶ 38-39; DSUF ¶ 55; PRUF ¶ 55.)

Over a year later, on July 24, 2017, Claim Doc's counsel sent a third letter to Needham's counsel alleging breach based on different evidence but similar accusations. (Compare Defs.' Ex. K with Pls.' Ex. P.) Claim Doc no longer cited to the "writing from Mary Catherine Person" in which Defendant Fishbone allegedly proposed a plan to solicit Wirerope as a customer, but instead pointed to discovery from a related lawsuit in the United States District Court for the District of New Jersey (discussed in more detail below). In that letter, Claim Doc's counsel asserted that "[d]iscovery in the matter INDECS Corp. & Wirerope Works, Inc. v. Claim Doc, LLC, No. 16-4421 (D.N.J.), has revealed that your client, David Fishbone, violated paragraph 6 of the Settlement Term Sheet." (DSUF ¶ 53; PRUF ¶ 53; Pls.' Ex. P.)

After notifying Needham of the alleged breach in July 2017, Claim Doc requested mediation with Judge Strawbridge as required by the Term Sheet. (PC ¶ 36; Defs.' Ex. O.) The mediation was held in August 2017, but was unsuccessful in resolving the dispute. (PC ¶ 37.) Shortly thereafter, Claim Doc brought the current action claiming, among other things, breach of contract. (PC ¶ 38; Defs.' Ex. Q.)

**E.      Facts Pertinent to the Tortious Interference Claim: Termination of the Wirerope-Claim Doc Relationship**

On May 11, 2016, approximately two months after Claim Doc and Needham entered into the Term Sheet, Claim Doc and Wirerope terminated their business relationship.[2] (PC ¶ 10; DSUF ¶¶ 5-6.) Less than a week later, on May 16, 2016, Wirerope entered into an agreement to obtain its claims review and auditing services from a competing business called Claim Watcher. (DSUF ¶¶ 37, 39; PC ¶ 17; Pls.' Ex. E. at 114-16.) In fact, Claim Watcher had been created in January 2016 by Needham's principal, Fishbone, along with Tom Knox of INDECS. (DSUF ¶¶ 9, 37; PRUF ¶ 37.)

Over the next few months, a dispute arose involving Claim Doc, INDECS, and Wirerope over whether Claim Doc was required to perform certain post-termination services for INDECS with respect to Wirerope's health plan. (PC ¶ 11.) INDECS believed Claim Doc was required to handle appeals stemming from audit work Claim Doc had performed during the pendency of the contract, but Claim Doc denied any such obligation. (PC ¶¶ 11, 13.) At the same time, a dispute arose between Claim Doc and Wirerope over whether Wirerope still owed fees to Claim Doc for auditing work Claim Doc had performed before the contract was terminated. Claim Doc insisted Wirerope owed it roughly $100,000 in auditing fees. (PC ¶ 12.)

Wirerope's Vice President of Finance, Harold Kropp, conceded in a deposition that Wirerope did in fact owe Claim Doc $79,000 in auditing fees but that Wirerope had refused to pay at the time due to Claim Doc's refusal to perform the post-termination services described above.

---

[2] The parties appear to dispute whether Claim Doc or Wirerope made the decision to terminate the relationship. (Compare PC ¶ 10 with DSUF ¶ 42.) While this fact is not entirely clear in the record, it is not material.

(Kropp Transcript 124-26[3].) Kropp further testified that INDECS told Wirerope that Claim Doc treated other former clients more favorably in that Claim Doc had performed post-termination services in the past.[4] (Id.)

Two days before the termination of the Claim Doc-Wirerope relationship (May 9, 2016), a newly terminated Claim Doc employee forwarded to Needham's principal, Fishbone, an internal Claim Doc email regarding post-termination services Claim Doc had performed for another client, Vita Nonwovens. (Pls.' Ex. R at 107-09.) The employee did so thinking the email would be useful evidence for INDECS in its dispute with Claim Doc. (Id. at 112-13.) The terminated employee later went to work for Fishbone at his new company, Claim Watcher. (Id. at 28.)

Claim Doc now asserts that the above set of facts establishes that Needham tortiously interfered with the Joinder Agreement by encouraging Wirerope to withhold auditing fees, apparently to pressure Claim Doc to perform post-termination services for INDECS.

## F.    The New Jersey Lawsuit

The background necessary to understand the issues before me is further complicated by a lawsuit brought in the United States District Court for the District of New Jersey (the "New Jersey Lawsuit").

As noted above, the ongoing disputes among Claim Doc, INDECS, and Wirerope culminated in a lawsuit in which Wirerope and INDECS sued Claim Doc over Claim Doc's alleged post-termination duties and Claim Doc sued Wirerope for the outstanding auditing fees. Claim

---

[3] Claim Doc attached an incomplete excerpt of Kropp's transcript to its brief in opposition as Exhibit G.

[4] Claim Doc insists this representation by INDECS was false but does not cite any evidence to that effect. The only evidence cited by either party on Claim Doc's treatment of other former clients is that Claim Doc did in fact perform post-termination services for at least one. (Defs.' Reply Ex. A at 155.)

Doc also sued INDECS in the same lawsuit for allegedly inducing Needham to violate the non-compete paragraph of the Term Sheet. See INDECS Corp. v. Claim Doc, LLC, No. 16-cv-4421, 2020 U.S. Dist. LEXIS 182931 (D.N.J. Oct. 2, 2020). Needham and Fishbone were not parties to the New Jersey Lawsuit.

Discovery in the New Jersey Lawsuit touched on the termination of Wirerope and Claim Doc's business relationship, as well as Wirerope's decision to replace Claim Doc with Fishbone's competing company, Claim Watcher. That discovery included depositions of Fishbone, Krambeck, Wirerope's Vice President of Finance, and others. (Defs.' Exs. A, C, F & G; Pls.' Exs. B, E, G, L & N.) This discovery seems to be the primary basis for Claim Doc bringing the breach of contract allegations currently at issue.

The claims between Wirerope and Claim Doc, including Claim Doc's claim for unpaid auditing fees, were ultimately settled. See INDECS Corp., 2020 U.S. Dist. LEXIS 182931, at *1-2.

### G.    The New Jersey Opinion

After Wirerope settled out of the case, the New Jersey Lawsuit ended with the Honorable Kevin McNulty of the United States District Court for the District of New Jersey dismissing Claim Doc's and INDECS's remaining claims on summary judgment in an opinion dated October 2, 2020 (hereinafter "Judge McNulty's Opinion"). INDECS Corp., 2020 U.S. Dist. LEXIS 182931. At that time, the only remaining claims were "INDECS's claims of breach of fiduciary duty and breach of the duty to indemnify … and Claim Doc's tortious interference and civil conspiracy claims."

Id. at *2.

Judge McNulty's dismissal of Claim Doc's tortious interference claim was based on his conclusion that INDECS had not acted with the requisite "malice" in replacing Claim Doc with Claim Watcher. Judge McNulty noted that INDECS had legitimate reasons to switch auditing companies to preserve Wirerope as a customer, and was not bound by the fact that Claim Watcher's principal, Fishbone, could not solicit Wirerope's business himself. Id. at *21. Although there was evidence that Fishbone had solicited Wirerope before agreeing with Claim Doc not to compete, Judge McNulty found that this could not amount to tortious interference by INDECS because Fishbone was, at the time, free to make such solicitations. Id. at *8-9. He stated that "[w]hatever non-compete obligation there may [have been] did not arise until March 10, 2016," the date of the settlement agreement between Claim Doc and Needham in the case before me. Id.

Judge McNulty's opinion also discusses evidence relating to the conduct of Fishbone, who was not a party to that lawsuit but is a party to this one. At his deposition in the New Jersey Lawsuit, Fishbone testified "that he complied with the terms of the [Term Sheet] during its term— i.e. March 10, 2016 (the date on which the settlement conference took place) through May 11, 2016 (the date on which the Settlement Term Sheet terminated as to Wirerope)." Id. at *12; see also id. at 10 ("Fishbone also testified that in order to implement the information screen, he had INDECS and [Wirerope] stop sending him communications of any kind related to Wirerope.") Based on this testimony, Judge McNulty remarked that Defendant Fishbone "has not been shown to have violated [the Term Sheet] by soliciting Wirerope, directly or indirectly, during its term." Id. at *21.

Based on Judge McNulty's findings in the New Jersey Opinion, Needham amended its Motion for Summary Judgment that is presently at issue. Needham presses that Judge McNulty's findings create a basis, as a matter of law, for me to find that issue preclusion warrants summary judgment in its favor on all remaining claims.

### H.    Relevant Procedural History

Needham filed a motion for summary judgment on July 30, 2019. That motion was denied without prejudice on January 8, 2021 after I granted Needham's motion for leave to file a supplemental motion for summary judgment based upon the issuance of the New Jersey Opinion. This Amended Motion for Summary Judgment was filed on January 22, 2021, and is now before me.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).

A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party. Id. Alternatively, no dispute of material fact exists if there is no evidence

from "which the jury could reasonably find for the plaintiff." Id. at 252. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001); Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013). Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

## III.   DISCUSSION

Needham's Amended Motion for Summary Judgment seeks judgment in its favor on the entirety of the Complaint brought by Claim Doc. Needham contends issue preclusion warrants summary judgment on all three claims. Alternatively, Needham asserts that Claim Doc's continued contractual performance in making installment payments constituted a waiver of Claim Doc's breach of contract claim. Finally, Needham argues Claim Doc's tortious interference claim fails for lack of proof.

Initially, I note that both sides agree the Term Sheet was a binding contract. (Needham's Brief at 25 ("[T]here [is] an express contract between the parties."); Claim Doc's Brief at 1.) And Claim Doc concedes there can be no claim for unjust enrichment when the parties' relationship is governed by contract. (Claim Doc's Brief at 19.) I will therefore dismiss Claim Doc's claim for unjust enrichment.

As to Needham's remaining arguments, I disagree with Needham that Judge McNulty's opinion precludes consideration of issues that would warrant dismissal of Claim Doc's claims. I also disagree with Needham's waiver argument. Finally, I find that Claim Doc has demonstrated sufficient evidence of tortious interference for that claim to proceed to a factfinder. My reasons are explained below.

### A.   Issue Preclusion

Under the doctrine of issue preclusion, also called collateral estoppel, "[w]hen an issue of

fact or law is actually litigated and determined by a valid and final judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Hernandez v. Region Nine Hous. Corp., 684 A.2d 1385, 1392 (N.J. 1996) (emphasis deleted) (quoting Restatement (Second) of Judgments § 27 at 250 (1982)).[5] This rule serves "to promote efficient justice by avoiding the re-litigation of matters which have been fully and fairly litigated and fully and fairly disposed of" and to "protect individuals from vexatious repetitious litigation." Lopez v. Patel, 969 A.2d 510, 518 (N.J. Super. Ct. App. Div. 2009) (quotation marks omitted).

Preclusion is appropriate when: "(1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding." First Union Nat. Bank v. Penn Salem Marina, Inc., 921 A.2d 417, 424 (N.J. 2007). Complete mutuality of parties is not required. Ziegelheim v. Apollo, 607 A.2d 1298, 1305 (N.J. 1992).

Regarding the fourth element, issues that may have been passed on in the prior judgment are not "essential" if the outcome does not depend on these issues. See Restatement (Second) of Judgments, § 27 cmt. h; Mansoldo v. State, 898 A.2d 1018, 1024 (N.J. 2006). And a judgment is not preclusive as to a determination that was merely dictum, that is, "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the

---

[5] Because the New Jersey Opinion was issued by a federal court hearing a state-law claim, the preclusion law of the forum state, New Jersey, applies. See Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 508-09 (2001); Hately v. Watts, 917 F.3d 770, 777 (4th Cir. 2019) (applying Semtek to claims within the federal court's supplemental jurisdiction). Here, both parties cite exclusively to federal preclusion law. However, it does not appear there is any material difference between federal and state preclusion law as it applies to this case.

holding." <u>Coleman v. Greene</u>, 845 F.3d 73, 76 (3d Cir. 2017); Restatement § 27 cmt. h.

Needham argues all three of Claim Doc's claims (breach of contract, tortious interference, and unjust enrichment) should be dismissed based on issues decided in Judge McNulty's opinion. As to the tortious interference claim, Needham addresses only Wirerope's reasons for joining the New Jersey Lawsuit and does not address Wirerope's withholding audit fees. Because, as explained below, I find only the latter fees issue could amount to harm to a contract, I do not reach Needham's issue preclusion argument as to this claim. As to Claim Doc's unjust enrichment claim, it will be dismissed due to the existence of a valid contract, so I will not consider whether issue preclusion provides an additional ground for dismissal. I therefore only analyze issue preclusion with respect to the contract claim.

The first question is whether issues determined in the New Jersey Lawsuit are identical to issues presented by Claim Doc's contract claim in this Court. To prevail on its contract claim, Claim Doc must show: "(1) the existence of a contract; (2) a breach of a duty imposed by the contract and (3) resultant damages." <u>Omicron Sys. v. Weiner</u>, 860 A.2d 554, 564 (Pa. Super. Ct. 2004). Needham argues that Judge McNulty decided one of those elements against Claim Doc: whether Needham breached the non-compete provision of the Term Sheet.

In the New Jersey Lawsuit, Claim Doc's claim was that INDECS tortiously interfered with the Term Sheet by encouraging Needham to breach it. The elements of that claim were "(1) the existence of a contract; (2) interference that was intentional and done with malice; (3) the loss of the contract as a result of the interference; and (4) damages." <u>INDECS Corp.</u>, 2020 U.S. Dist. LEXIS 182931, at *18. Needham's breach of the Term Sheet was therefore placed at issue in the New Jersey Lawsuit as the third element of Claim Doc's tortious interference claim. However, I

disagree with Needham that Judge McNulty decided this issue.

Instead, Judge McNulty's analysis centered on whether INDECS acted with "malice." See id. at *21-23 ("I do not find that INDECS's actions were done with malice."). Wrongful conduct by Needham was only relevant to Judge McNulty's analysis to the extent INDECS could be blamed for it. But Judge McNulty found that INDECS "had its own legitimate business interests to pursue" by replacing Claim Doc to preserve Wirerope's business. Id. at *21. Therefore, even a breach by Needham with which INDECS was involved would be unlikely to be wrongful on INDECS's part. Judge McNulty had no reason to consider whether Needham might have breached the Term Sheet in ways either independent of INDECS or that advanced INDECS's legitimate business interest in finding a satisfactory replacement for Claim Doc.

Needham makes the bold pronouncement that Judge McNulty found "that Defendants committed no breach of contract," which "was essential to its holding." (Needham's Brief at 8.) But Needham cites to one sentence from Judge McNulty's opinion to support this assertion: "The actual party to the Settlement Agreement, Fishbone, has not been shown to have violated it by soliciting Wirerope, directly or indirectly, during its term." INDECS Corp., 2020 U.S. Dist. LEXIS 182931, at *21. Read in context, however, that portion of Judge McNulty's opinion involved a discussion of the "malice" element needed for a tortious interference claim—not the element of harm to the contract at issue here. See id. To the extent the sentence purports to find that Needham did not breach the Term Sheet in any respect, it would be unnecessary to Judge McNulty's holding and therefore dictum. Coleman, 845 F.3d at 76.

In short, I agree with Claim Doc that Judge McNulty did not reach whether Needham breached the Term Sheet. To the extent there was a factual finding regarding Needham's solicitation of Wirerope, removing the finding would not seriously impair the "analytical

foundations of the holding." <u>Coleman</u>, 845 F.3d at 76. Therefore, Judge McNulty's finding regarding Needham's solicitation of Wirerope is not essential to its holding and not preclusive of issues before me.

     **B.**     **Waiver**

     Needham next argues that summary judgment should be granted on the contract claim because Claim Doc waived its right to assert breach. Needham contends Claim Doc's continued contractual performance in the form of payments under the Term Sheet constituted a waiver of Claim Doc's contract claim.

     Under the doctrine of election of remedies, when one party commits a material breach of contract, the other party has a choice between "two inconsistent rights": (1) "he or she can either elect to allege a total breach, terminate the contract, and bring an action," or (2) "instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach—but the nonbreaching party, by electing to continue receiving benefits pursuant to the agreement, cannot then refuse to perform his or her part of the bargain." <u>Gillard v. Martin</u>, 13 A.3d 482, 487 (Pa. Super. Ct. 2010) (quoting 13 R. Lord, Williston on Contracts (4th Ed. 1990), § 39:32, p. 645). Under this principle, "where a non-breaching party opts to continue performing post-breach and receiving benefits as it would under the contract, the law presumes the non-breaching party has elected against a remedy of recission, or retroactive termination, of the contract, and the non-breaching party cannot recover restitution damages as if the contract ceased to exist at the time of the breach." <u>Gamesa Energy USA, LLC v. Ten Penn Center Assocs., L.P.</u>, 217 A.3d 1227, 1240 (Pa. 2019).

     Needham, however, is asking for something more than merely holding Claim Doc to its election of remedies. In Needham's view, Claim Doc waived <u>all</u> remedies when it opted to

continue payments under the Term Sheet after accusing Needham of soliciting Wirerope.

The law does not support Needham's position. A party who elects to perform in the face of a breach loses only the right to treat the breach as "total" but retains the right to "seek recovery of its damages for the breach." Gamesa Energy, 217 A.3d at 1240. A party does not suffer the loss of all contractual rights merely by fulfilling its own obligations. See id.

Here, the most Claim Doc may have waived by continuing to pay installments to Needham under the Term Sheet was its right to declare Needham's breach total and seek recission of the entire settlement. Claim Doc did not lose its right to sue Needham for damages caused by Needham's alleged breach. However, as Claim Doc points out, the distinction between recission and contract damages in this case is academic. The Term Sheet provides that, in the event of Needham's breach, Needham is to "return all money paid to it under [the] … term sheet." (Pls.' Ex. A ¶ 8.) Therefore, whether viewed as a recission or contract remedy, Claim Doc did not waive its right to seek return of its settlement payments in an action for breach of contract.

The case on which Needham relies, Agsco Equip. Corp. v. Borough of Green Tree, 443 A.2d 284 (Pa. Super. Ct. 1981), does not support Needham's position. Agsco dealt with the rule that a total breach acts as an excuse for the non-breaching party's continued performance. The court there held that a party who elected to continue to perform in the face of a breach lost the right to treat the breach as total and thus the defense. Id. at 287-88. Such an issue is not presented here.[6]

I will therefore deny Needham's Motion for Summary Judgment as to the waiver argument.

---

[6] The statement in Agsco that the plaintiff "waived any claim that [the defendant's alleged breach] constituted a breach by the [the defendant]," 443 A.2d at 288, read in context, refers only to whether the plaintiff could raise the alleged breach as an excuse for its own performance, not whether the alleged breach was waived for all purposes.

### C.      Sufficiency of Claim Doc's Tortious Interference Claim

Needham argues that Claim Doc's tortious interference claim (Count II) should be dismissed for lack of evidence.

Under Pennsylvania law, to prevail on a claim for tortious interference with an existing contract, the plaintiff must show:

> (1) the existence of a contractual … relationship between the plaintiff and a third party;
>
> (2) purposeful action by the defendant[] specifically intended to harm [that] existing relationship …;
>
> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) legal damage to the plaintiff as a result of the defendant's conduct[.]

Acumed LLC v. Advanced Surgical Servs., 561 F.3d 199, 212 (3d Cir. 2009) (line breaks added).

Here, Claim Doc alleges Needham tortiously encouraged Wirerope to withhold payments Wirerope owed Claim Doc under the Joinder Agreement. Claim Doc and Needham dispute whether a contract was in effect, whether Needham purposefully interfered with it, and whether Needham did so without privilege or justification.

#### 1.      Existence of a Contract

Claim Doc alleges Needham interfered with Wirerope's obligation under the Joinder Agreement to pay Claim Doc for Claim Doc's audit services. Needham contends no such contractual obligation existed because Claim Doc itself terminated the Joinder Agreement on May 11, 2016, before the alleged tortious interference.

I disagree with Needham's argument. Claim Doc is not alleging Needham caused the termination of the Joinder Agreement. Rather, Claim Doc asserts Needham persuaded Wirerope to withhold money for obligations already incurred during the Agreement's term. Wirerope's payment obligation expressly survives termination of the Joinder Agreement, and Wirerope's Vice

President of Finance admitted Wirerope had accrued obligations for audit fees. (Pls' Ex. H ¶ 10(e); Kropp Transcript 124.)

I therefore find that Claim Doc can prove the existence of a contract between it and Wirerope.

### 2. Purposeful Interference

Needham next disputes whether it purposefully interfered with Wirerope's obligations under the Joinder Agreement. According to Claim Doc, Needham purposefully interfered in two ways:

First, Claim Doc argues that Needham, in its role as consultant for INDECS, encouraged Wirerope to withhold audit fees from Claim Doc by representing that Claim Doc treated other former clients more favorably. In support, Claim Doc points to the testimony of Wirerope's Vice President of Finance, Harold Kropp, who conceded that Wirerope owed $79,000 in fees but withheld them because INDECS represented Claim Doc had performed post-termination services for other clients. (Kropp Transcript 124-26.) Kropp further testified that Wirerope and INDECS discussed what recourses Wirerope may have for Claim Doc's nonperformance. (Id. at 128-30.) Technically, Kropp's testimony only implicates INDECS, not Needham, in these conversations. However, a factfinder could infer that Needham was involved: Needham was in charge of the Wirerope account for INDECS at the time, and, as discussed below, Needham was actively gathering evidence in support of INDECS's position through somewhat surreptitious means. This could raise an inference that Needham was seeking to use Wirerope's outstanding balance of audit fees as leverage to the advantage of Needham's client, INDECS, in its relationship with Claim Doc.

Claim Doc further challenges Needham's representation that Claim Doc treated other clients more favorably as false and an attempt to mislead Wirerope. However, Claim Doc offers no evidence that this is so. Therefore, although a reasonable factfinder could find that Needham encouraged Wirerope to withhold audit fees in retaliation for Claim Doc not performing post-termination services, it would go too far to conclude that Needham did so by misleading Wirerope. Nevertheless, tortious interference with a contract may be accomplished through "a simple request or persuasion exerting only moral pressure." Restatement (Second) of Torts, § 766 cmt. k. A factfinder could conclude such was the case here.

Second, Claim Doc accuses Needham of conspiring with a newly terminated Claim Doc employee to extract internal Claim Doc emails purporting to show Claim Doc performing post-termination services for a client other than Wirerope. The employee essentially admitted these facts in deposition. (Pls.' Ex. R at 107-13.) Claim Doc does not accuse Needham of violating any law by obtaining Claim Doc's internal emails. Nevertheless, a factfinder could view Needham's conduct of pursuing internal emails and using them to pressure Wirerope to withhold money from Claim Doc as a dishonest business practice. In the context of a tortious interference claim, "[v]iolation of recognized ethical codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods may … be significant in evaluating the nature of the actor's conduct as a factor in determining whether his interference with the plaintiff's contractual relations was improper or not." Restatement (Second) of Torts, § 767 cmt. c.

Claim Doc alleges Needham's tortious interference additionally included encouraging Wirerope to assert a claim in the New Jersey Lawsuit. However, Claim Doc does not explain how merely litigating this claim amounted to "harm[ing] a[] … [contractual] relationship." Acumed,

561 F.3d at 212. There could be no harm to Claim Doc's working relationship with Wirerope as such had ended months prior, and all Claim Doc wanted from Wirerope was payment for services already rendered—payment Wirerope was withholding irrespective of its participation in the New Jersey Lawsuit. In addition, Claim Doc has offered no evidence that Wirerope's claim in the New Jersey Lawsuit was frivolous or not bona fide. I therefore agree with Needham that the New Jersey Lawsuit cannot support Claim Doc's tortious interference claim and do not reach Needham's argument that Claim Doc is attempting an end-run around the limitations in the tort of malicious use of civil proceedings.

I therefore find that a reasonable factfinder could conclude Needham intentionally interfered in the contractual relationship between Wirerope and Claim Doc by encouraging Wirerope to withhold auditing fees.

### 3.    Lack of Privilege or Justification

Finally, Needham argues that, even if it did interfere in a contract between Wirerope and Claim Doc, its actions were justified.[7]

Needham claims it was privileged to interfere with Claim Doc's relationship with Wirerope because Needham's principal, Fishbone, who also founded Claim Watcher, was Claim Doc's competitor. Citing the Restatement, Needham argues a business is privileged to compete for prospective clients by encouraging them to break contracts with existing partners. See Restatement (Second) of Torts § 768.

---

[7] Most of Needham's argument for justification is addressed solely to Wirerope's participation in the New Jersey Lawsuit and does not address Wirerope's withholding of audit fees. Because I find that entering the New Jersey Lawsuit was not, in any event, harm to a contract, I need not reach whether Needham was justified in persuading Wirerope to do so.

The "competition" Needham describes is not the basis of Claim Doc's tortious interference claim. Claim Doc is not arguing Needham tortiously interfered by stealing Wirerope as a client. Rather, Claim Doc alleges Needham encouraged Wirerope to withhold fees already accrued for services already performed—fees Claim Watcher could not compete for because the job was already done. Moreover, Claim Doc alleges Needham interfered not to obtain Wirerope's business but to pressure Claim Doc to perform services for INDECS. The actions described are not competition and are not privileged as such.

I therefore find that Claim Doc has adduced sufficient evidence to support the challenged elements of its tortious interference claim. Accordingly, I will deny Needham's Motion for Summary Judgment as to that ground.

## IV.   CONCLUSION

In light of the foregoing, Needham's Motion for Summary Judgment is granted in part only with respect to Claim Doc's unjust enrichment claim. Needham's Motion for Summary Judgment is denied in all other respects.

An appropriate Order follows.